## Case No. 7,415.

JOHNSON et al. v. THIRTEEN BALES, Etc.

[2 Paine, 639;[1] 6 Hall. Law J. 97; Van Ness, 45.]

Circuit Court, D. New York. 1814.

---

[1] [Reported by Elijah Paine, Jr., Esq.]

D. S. Jones and Griffin, Emmet & Wells, for libellants.

Colden, Slosson & Irving, for claimant.

VAN NESS, District Judge. It is contended by the libellants, that James Beswicke & Son are alien enemies, and that this appears (1) by the pleadings; (2) by the papers found on board the captured vessel.

By the pleadings, because it is alleged in the libel, and not denied in the claim. I am of opinion that the allegation in the libel is sufficiently plain and explicit. That it is a material one, forming the very foundation of this proceeding, and that, according to all known rules of pleading, the main fact which sustains the prosecution, must, if it can, be negatived, or it will be taken as admitted. That this allegation is material and ought to be denied, the case of The Beurse Van Koningsberg is a direct and positive authority. 2 C. Rob. Adm. 169. It shows, conclusively, that enemy's interest must always be negatived in the claim. But, aside from this, I think the fact sufficiently proved by the papers found on board, and now before the court. The letters of Beswicke & Son leave no doubt that they are British subjects residing in Saddleworth, England; and if they did, that from Blackstock to Hugh Auchincloss would remove it. Being satisfied on that subject, it is unnecessary to determine how far their residence alone would invest them with a hostile character as to this transaction. It is a question on which much may be said in other cases, and I have deemed it most expedient to avoid an examination of it in one that does not require it.

In order to dispose of all the objections arising out of the form of the pleadings, I will, while on this part of the case, notice another raised by the counsel of the claimant, though in a late stage of the argument. It is urged that the libel should not only allege that the claimants are "alien enemies," but that they are "alien enemies resident abroad." It is very plain that both the libel and claim, in this case, are

inaccurately and loosely drawn. But it appears to me, that whether it be alleged or not, if the claimants be admitted or proved to be alien enemies, they must be presumed and taken to be in the ordinary and usual situation of alien enemies, to wit, in their own country, at any rate out of this. They cannot be here, without a letter of safe conduct, or by permission of the government. Once acknowledged to be alien enemies, they cannot be presumed to be here and to have that letter or that permission. That presumption would be unnatural and violent. If they have either, they ought to show it if they mean to make it the foundation on which to assert a right or to claim a privilege. On general principles, as enemies, they have no rights, no privileges, and if they mean to be exempted from the general rule, from the general operation and effect of a state of war, they must show themselves within some of the stipulated or customary exceptions. I believe it may be laid down as the general rule, that all presumptions must be against them. Sir William Scott says, the onus probandi in all prize causes is on the claimant. 4 C. Rob. Adm. 235. And in Sylvester's Case, 7 Mod. 150, it is decided by the court, that whatever the protection or license of an alien enemy may be, it must be set forth in the pleadings. Although these books are not esteemed very high authority, this ·case receives credit and respect from a reference in Bacon. But I think it can be shown, by precedent, that the allegation is not material. "Alien," says a learned judge, is a legal term, and amounts to many words. In Sylvester's Case, there was a plea that the plaintiff was "an alien enemy, born under the allegiance of the French king." To this there was a demurrer, and the plea was held good. The allegation, therefore, that he was resident abroad, was not deemed necessary. Daubigny v. Davallon, 2 Anstr. 462. In another case. the plaintiffs are alleged to be "Frenchmen, aliens, and enemies to the king of Great Britain," and that was held enough. The word "Frenchman," said the chief baron, "shows that they are the subjects of a nation at war with us. The averment that they are enemies of the king, is the same thing as if the plea had said that they adhere to his enemies." Here the claimants are alleged to be "subjects of the kingdom of Great Britain and Ireland, and enemies." "Subjects of the king of Great Britain" is certainly equivalent to "Englishmen and aliens," and they are alleged to be "enemies"—from which it must follow, that they adhere to the enemy, and then whether they are aliens, is perfectly immaterial. If they adhere to the enemy, they must be treated as such. The terms, "subjects of the kingdom of Great Britain and Ireland, and enemies." therefore embrace every allegation which, by these decisions, is deemed necessary. In support of these allegations, it is competent, though

not necessary, for the captors to prove the residence of the claimants, which has been abundantly shown to be in Saddleworth. In the common law courts, the defendant must set forth, in his plea, everything requisite to negative the right of the plaintiff to sue. Here the onus probandi is on the claimant. He must show himself entitled to all the privileges he claims. It being admitted, then, and if not admitted, proved, that Messrs. Beswicke & Son are alien enemies, resident in the enemy's country, the question arises—whether they can be heard in this court; whether the claim of William Falconer, in their behalf, can be sustained, or must be rejected?

This question, abstractly considered, is simple enough, and, in my judgment, presents but few difficulties. But, in consequence of the course which the counsel thought proper to take, and the variety of topics which were introduced and discussed in the progress of the argument, it has become somewhat involved and complicated. I had at first intended to take as extensive a view, and give as full a discussion of each distinct point which had been made, as my convenience would allow. But I was embarrassed and arrested in the execution of this intention, by recollecting the claim interposed on the part of the government; by my ignorance of the precise ground that would· be taken on the argument of that claim; and, also, by the consideration that some of the questions incidentally discussed here might be made principal grounds of defence in the other cases which are to follow this, and be more directly presented for the consideration of the court. In order, therefore, to avoid a premature and anticipated decision of questions involving the rights of other claimants, and on which other counsel may wish to be heard, I have found it necessary to take a view of this case somewhat concise and circumscribed. Beside the authorities which have been cited to show that an alien enemy not here under letters of safe conduct, or under the protection of the government, cannot sue in the common law courts, there are some others to which I shall refer.

The first is the Case of Sylvester, 7 Mod. 150, already alluded to. It is so early as the 1st of Queen Anne, and although it is not full in point, yet it will be perceived that it bears pretty directly on this question, and in principle is conformable to the later cases which will be examined.

The next case to which I shall refer is that of Wells v. Williams, reported at length in 1 Ld. Raym. 282, and concisely in 1 Lutw. 15, and 1 Salk. 46. This case ought to have been stated before the last, as it is anterior in its date. being the 9 Wm. III. It was an action of debt on bond. The defendant plead that the plaintiff was an alien enemy, and came into England "sine salvo conductu." The plaintiff replied, that at the time of mak-

ing the bond he was, and continued in the country, "per licentiam et sub protectione domini regis." To this replication the defendant demurred, and contended, that although the plaintiff was in England, by license, and under protection, yet, without a letter of safe conduct, he could not maintain a suit. The chief justice, in deciding the case, said, "an alien enemy, who is here in protection, may sue his bond or contract; but an alien enemy, abiding in his own country, cannot sue here." This case, if it be good authority, seems to be decisive on the question under consideration, and so far from being overruled or questioned, it is manifestly supported by the subsequent decisions that have been found or cited.

The case of Ricord v. Bettenham, 3 Burrows, 1734, was an action on a ransom bill. In this the authority of the last case, and the principles on which it rested, were fully recognized; and although the action was allowed, it was admitted to be an exception to the general rule, and sustained exclusively on the ground that in the single instance of ransom bills it was the practice of some other European nations. There are two other cases on ransom bills reported in Doug. 641, 649, note; Cornu v. Blackburne; and Anthon v. Fisher. These refer to the last case of Ricord v. Bettenham, and recognize these suits on ransom bills, as founded on a solitary exception to the general disability of an alien to sue, if resident abroad. These cases were prior to the statutes of 22 Geo. III., which put an end to suits on ransom bills.

The next is that of Daubigny v. Davallon (in the exchequer) Anstr. 462. This was a bill for the discovery of goods received by the defendants as agents for the plaintiffs, stating the discovery to be necessary for supporting actions at law, intended to be brought by the plaintiffs for the value of the goods. The defendants pleaded, in substance, that the plaintiffs were alien enemies, resident in France, and relied on the very cases I have cited from Strange, Lord Raymond and Douglass. It was decided that the plea was sufficient, and McDonald, chief baron, in delivering the opinion of the court, after stating that alien friends may institute suits, and the particular circumstances under which even alien enemies may sue, says: "But this claim to the protection of our courts does not apply to those aliens who adhere to the king's enemies. They seem upon every principle to be incapacitated from suing either at law or in equity. The disability to sue is personal. It takes away from the king's enemies the benefit of his courts, whether for the purpose of immediate relief, or to give assistance in obtaining that relief elsewhere." I would ask the attention of the counsel for the claimants to this decision. It is singularly applicable to the peculiar features of their case, and to the nature of the proceeding here: aliens adhering to the king's enemies shall derive no benefits through his courts.

After such decisive authorities, it must be unnecessary to multiply them. They are too numerous to admit of a minute examination, and I shall only refer to a few others, which prove incontestably that an alien enemy, commorant in his own country, cannot sue in the courts of the other. Sparenburgh v. Bannatyne (1797) 1 Bos. & P. 163; M'Connell v. Hector (1802), 3 Bos. & P. 113; Le Bret v. Papillon (1804) 4 East, 502; De Luneville v. Phillips (1806) 2 Bos. & P. [N. S.] 97. And this surely is all that is necessary to establish; for if neither of two belligerents can sue the other, how is either to be sued? To prove that neither can sue, is all that can be proved.

But Beswicke & Son proceed by an agent, and I shall cite one other authority to show, that in the common law courts they derive no advantage from that circumstance. The case to which I allude is that of Brandon v. Nesbitt, 6 Durn & E. [Term R.] 23. It was an action on a policy of insurance, effected by the plaintiff on account of alien enemies resident in France, and who were indebted to him, the plaintiff, a British subject, in a sum exceeding the amount of the policy, and he intended to reimburse himself in part by a recovery in this suit. Lord Kenyon decided, that an action would not lie, either by or in favor of an alien enemy, under such circumstances. That what he could not do directly he should not do indirectly. This is precisely the case here, and brings the common law authorities directly to the point, before the court. The case of Bristow v. Towers, Id. 35, is similar in principle. Having, as I think, sufficiently ascertained that alien enemies, commorant in their own country, cannot sue in the common law courts, it is proper to examine what are the principles and practice adopted by courts proceeding according to the law of nations and of war.

The first authority to which I shall refer, in pursuing this inquiry, is Bynkershoeck. For of all writers on public and general law, he is the most lucid and satisfactory, on the particular subjects of which he treats. In the 25th chapter of his treatise on the Law of War, at the head of the 8th section, the learned translator lays it down, as the clear and indubitable result of his author's reasoning, "that one who resides in an enemy's country, under a safe conduct from the sovereign, may sue and be sued." This is the principle adopted by the common law courts. In the 7th chapter of this treatise will be found what the author considers, in this respect, the disabilities of alien enemies not thus in the country. In order to meet the remarks which were made upon it, I will state it with some precision. The author says, "that except in the case where there is a mutual commerce permitted by both belligerents, an alien enemy has no persona standi in judicio." This phrase is rendered,

by the learned translator, "no right to be heard as plaintiff in courts of justice," and this explanation is relied on to support the rights of the claimants to be heard. It is extremely doubtful, I think, whether this be a just exposition of these words; but it is perfectly immaterial whether it be or not. Admit, for a moment, that by these words, the author means to say, that an alien enemy "cannot be heard as plaintiff in a court of justice;" and admit, also, all that was said by the counsel, that the present claimants must be considered, not as plaintiffs, but defendants; that in common law language, they are not suing, but sued; and how does it aid them? It is very obvious, that this mysterious sentence is but part of the law which Bynkershoeck means to state. It is but part of what he does state on the subject. He here says, that an alien enemy can have "no persona standi in judicio," "cannot be heard as plaintiff in courts of justice." And in the next section he proceeds—"moreover, if you do not permit your enemy to bring actions, neither can you, with justice, suffer them to be brought against your enemy;" and then goes on to reprobate, in very decisive language, a different course which had once been permitted by the Dutch government—so that the explanation of the learned translator may be permitted to remain as altogether harmless, and not at all at variance with the general law established by the context; which indubitably is, that the subject of one belligerent cannot have a legal personal standing in the courts of the other. He cannot appear or be heard in them, except in the cases which have been mentioned. He is totally ex lex. In the language of one of the English authorities, "he cannot have the benefit of the king's courts." Adopting this as the law, it becomes immaterial to inquire, whether the claimants must be viewed as plaintiffs or defendants; whether the proceeding is by, or against them. But surely they are not in the situation of ordinary defendants. In the first place, they are not brought here by any compulsory process. They appear here voluntarily, to assert and prosecute a right, not to defend property, which is demanded of them and in their possession, but to demand and recover property, the possession of which they have lost—not to resist an injury threatened, but to claim a benefit alleged to be withheld. And this is precisely what even the most doubtful authorities say they shall not be permitted to do.

Sir William Scott, who, when his opinions are not influenced by the executive authority, or by the peculiar situation and policy of his nation, is great and high authority, has adopted these principles in their whole extent. "In time of war," he says, "there is a total inability to sustain a contract, by an appeal to the tribunals of the one country, on the part of the subjects of the other. In the laws of almost every country, the character of alien enemy carries with it a disability to sue, or to sustain, in the language of the civilians, a 'persona standi in judicio.' The peculiar law of our own country, applies this principle with great rigor. The same principle is received in our courts of the law of nations; they are so far British courts, that no man can sue therein, who is a subject of the enemy, unless under particular circumstances, that pro hac vice discharge him from the character of enemy." The same principle then is received in the admiralty and common law courts; and nothing more is requisite than to conform its application to the nature of the subject in controversy, and to the proceedings of the respective courts. The proceedings in one are in personam, in the other in rem. If in the one, the benefit of enforcing a personal contract is withheld, so in the other must be withheld the benefit of claiming and demanding the thing or property in dispute. In the one, he shall not be entitled to a proceeding, by means of which he may recover the value of the property he pursues, nor in the other the property itself. Sir William Scott has not only recognized these principles in theory, but has evidently adopted them in practice. Wherever the character of the claimant, or the property seemed at all tinctured with hostility, the claim has either been rejected, or the property condemned. The grounds on which the cases of The Walsingham Packet [2 C. Rob. Adm. 78], that of The Juffrouw Louisa Margaretha [1 Bos. & P. 349, note], and others, referred to in the case of The Hoop [1 C. Rob. Adm. 196], were decided, although not precisely to this point, have their origin in the same principle. But I think the case of The Two Brothers, 1 C. Rob. Adm. 134, is very conclusive. It appears from that case, that even where property is captured within the limits of a neutral country, the original owners cannot claim it in the courts of the country at war with theirs. Their relief must be obtained through the neutral government of the violated territory. The property being hostile, as between the captors and owners was liable to capture, unless saved by the situation in which it was placed. If so, the government exercising jurisdiction over the place where it was taken, must do justice to the party whom it has permitted to be injured. That is the only way in which he can obtain it. This principle is certainly incontestable, and will presently receive an application to this case.

Two recent cases have been referred to by the counsel for the claimants, as authorizing the reception of this claim; The Hoop (decided at doctor's commons by Sir William Scott) [supra], and The Zodiack [1 Stew. Vice Adm. 333], in the vice-admiralty court, at Halifax. But on examining these cases, they will be found to be wholly unconnected in principle with this. The objection to this claim is, that it is offered by and on behalf of an enemy, who neither by municipal nor

general law, has a right to appear in our courts. But the moment he is divested even temporarily of his hostile character, he is restored to this right. He can be thus exonerated from the character of an enemy, either by an express act of the sovereign power of our own country, or by being placed in a situation where the law of nations interdicts all acts of hostility from being committed by or against him. This was precisely the situation of The Hoop [supra] and The Zodiack. The owners of the first were completely exonerated from the character and consequences of hostility, by a license from the British government, which, as to that government, legalized the transaction in which they were concerned, and quo ad that, rendered them friends. In everything that related to it, they were in the situation of neutrals at least. They had an undoubted right, therefore, to be heard in the courts of England on every question connected with that voyage. In their character of authorized and permitted traders, they were in a capacity to claim, and therefore to receive restitution. This is a very clear case. Show a license from this government to Messrs. Beswicke & Son to import these goods. and there is an end to the question. They shall not only be permitted to claim, but they shall have restitution.

The case of The Zodiack is equally clear. She was captured by a British cartel schooner, which was interdicted expressly by her own government, and by the law of nations, from committing any act of hostility during the voyage in which she was so employed as a cartel. Every hostile act, therefore, on her part was a violation of the faith of her own government, and of universal law. Every capture by her was illegal and void ab initio. She was not, during that voyage, the enemy of the American vessel; neither could capture the other. If the cartel had been brought in here as a prize, she must have been restored instantly, on the ground that she was divested of her hostile character by the flag she bore. The American vessel could not be captured by her, therefore, as an enemy. The faith of the government was pledged, that her cartels should comply with the usages of war, which require that they shall make no captures. and if they do, that they shall be restored. It is admitted in the case of The Zodiack. that the claim is received and restitution awarded, by reason of its own peculiarity. It is an exception to the general laws and rules of war, and cannot be adjudged on general principles. I shall not quote Chitty's Law of Nations as an authority. It contains nothing original or new. It is but a hasty and imperfect collection of authorities as to modern usages and practice, chiefly taken from Sir William Scott's decisions. All he says on the question before us, is a literal extract from the judgment in the case of The Hoop. The examination I have given this question, leaves no doubt in my mind, that Beswicke & Son, being alien enemies, commorant in the enemy country, cannot be heard in this court, and that the claim interposed by William Falconer in their behalf, must be rejected.